UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------------X
                                                        :
ROBERT SHKRELI,                                         :
                                        Plaintiff,      :
                                                        :
                        -against-                       :
                                                        :
JPMORGAN CHASE BANK, N.A.,                              :
                                        Defendant.      :
                                                        :
------------------------------------------------------------X
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3/27/15

13 Civ. 5647 (LGS)

OPINION & ORDER

LORNA G. SCHOFIELD, District Judge:

Defendant JPMorgan Chase Bank, N.A. ("Chase" or the "Bank"), terminated Plaintiff Robert Shkreli's employment with the Bank after accusing him of filing false credit bureau reports on multiple credit card accounts.  Plaintiff, who denies the allegations, brings suit against his former employer for intentional infliction of emotional distress ("IIED"), false imprisonment, violations of the Fair Debt Collection Practices Act ("FDCPA"), defamation and violations of the New York State Human Rights Law ("NYSHRL") and the New York City Human Rights Law ("NYCHRL").  Defendant moves for summary judgment.  For the reasons below, Defendant's motion is granted in part and denied in part.

I.    BACKGROUND

The facts are taken from the parties' Rule 56.1 statements and exhibits submitted in connection with the motions, and are undisputed except as otherwise noted.[1]

---

[1] Submissions of Plaintiff's counsel suffered from several deficiencies.  Throughout the response to Defendant's Rule 56.1 statement, Plaintiff cites "Shkreli Affidavit."  However, no such affidavit is included in Plaintiff's submissions.  Accordingly, any objection to Defendant's Rule 56.1 statement that relies solely on "Shkreli Affidavit" is not considered.  *See* Local Civil Rule 56.1(d) ("Each statement by the movant or opponent . . . must be followed by citation to evidence" in the record as explained in Federal Rule of Civil Procedure 56(c)); *see also Shepard v. Frontier Commc'ns Servs., Inc.*, 92 F. Supp. 2d 279, 284 (S.D.N.Y. 2000) ("Although not grounds for deeming all of the material facts set forth by defendants' Rule 56.1 statement as true, this Court will not consider any statements made by plaintiff in her Rule 56.1 statement that are

Plaintiff is a 40-year-old former Chase employee of Albanian origin.  Chase is a national banking association and operates approximately 5,600 consumer retail bank branches across the country.

### A.   Plaintiff's Employment at Chase

On December 14, 2004, Chase offered Plaintiff a position as a Consumer Banker at the bank's Astoria branch.  The position required Plaintiff to obtain "appropriate securities and insurance licenses" within 60 days of his employment.  Chase's offer letter to Plaintiff warned that failure to pass the licensing tests on the first attempt would terminate his position as a Consumer Banker.  Plaintiff provided Chase with an address in Maspeth, New York.  Plaintiff denies that he was ever employed by Chase in 2004 because he failed a required licensing test.

More than six years later, in August 2011, Chase hired Plaintiff for the position of Personal Banker.  Chase employment records for Plaintiff list the Maspeth address that he had initially provided in 2004.  Chase records also list the same social security number Plaintiff provided in 2004.

Plaintiff was assigned to a Chase branch in Larchmont, New York.  Until June 2012, Plaintiff reported to Branch Manager Arif Seyal, and thereafter reported to Branch Manager Alexandra Padilla.

---

not supported by a citation to the record.").  In addition, without seeking permission -- which would not have been granted -- Plaintiff has submitted at least three exhibits in excess of the fifteen-page limit set by the Court's Individual Rules.  One exhibit is 211 pages long.  Plaintiff has made no effort to excerpt exhibits "to include only relevant material" as required by the Individual Rules.  Plaintiff is advised that continued disregard for the Court's rules and instructions may result in sanctions.

### B.  Chase Investigative Report

On October 15, 2012, a Data Security Investigator for Chase Bankcard Services informed the Bank's Global Security and Investigations Department ("GSI") that she suspected Plaintiff had filed numerous false credit bureau reports alleging that he had been the victim of identity theft or fraud.  According to the Investigator's Report (the "Report"), Plaintiff had opened four credit card accounts in 2006 and 2007, failed to pay the associated charges and eventually filed four credit bureau reports claiming that he had not opened the accounts and was not responsible for them.  The Report stated that between February 11, 2010, and September 20, 2012, Plaintiff filed 11 credit bureau reports claiming that he had been a victim of identity fraud related to a Chase credit card.  Data Security eventually determined that the credit bureau reports were baseless and that Plaintiff was responsible for the outstanding charges on the credit cards.  The Report also listed three other charged-off credit cards in Plaintiff's name.

The Report stated that on October 1, 2010, Plaintiff had filed a criminal complaint with the New York City Police Department claiming that he had been the victim of identity theft between January 1, 2006, and June 1, 2009.  Plaintiff's criminal complaint lists "Home-Permanent" under the heading "Location," and under "Address" lists the Maspeth address.

The matter was referred to James Guilfoyle, a GSI investigator.  Guilfoyle obtained documents relating to (1) the various charged-off credit card accounts in Plaintiff's name, (2) a Chase checking account connected to those credit cards in Plaintiff's name and (3) Plaintiff's employment with Chase.  The documents showed that all four credit cards under investigation were opened between February 2006 and November 2007.

In April 2006, a credit card account was opened in Plaintiff's name, listing the Maspeth address as his home address and using the same social security number he had on record with

3

Chase.  The statements for this credit card were sent to a P.O. Box that Plaintiff used at least occasionally.  The account was used for overdraft protection on the Chase checking account in Plaintiff's name.  Statements for this credit card showed that the account was debited several times to provide overdraft protection to the checking account.

In February 2007, a credit card account was opened listing Plaintiff's name, date of birth and the Maspeth address.  In March 2007, a balance transfer check of $6,800 was debited from the credit card account and transferred to a Chase checking account in Plaintiff's name.  Several withdrawals were then made from the checking account using driver's license information that matched the driver's license information Plaintiff had provided to Chase in 2004.

Documents show two additional credit cards opened in Plaintiff's name in February 2006 and November 2007.  Based on his review, Guilfoyle concluded that the information on all four credit card applications was consistent and contained the same handwriting and signatures.  According to Guilfoyle, the purchases on the credit cards were routine everyday purchases and not extraordinary purchases typically associated with identity theft and stolen credit cards.

In his credit bureau report disputes, Plaintiff denied ever applying for any of the four credit cards and disclaimed any responsibility for the charges on the cards, which totaled $13,952.76.  Plaintiff claims he has been a victim of identity theft on multiple occasions.  In support, he includes two letters, both from more than one year after the last credit card at issue was opened.  The first is from New York Community Bancorp, Inc., dated March 9, 2009, informing Plaintiff that his debit card details were compromised, but that "[n]one of your bank account information was compromised or affected by the breach."  The second is from ECMC, a guarantor of federal student loans, dated March 31, 2010, informing Plaintiff that his information, including name, date of birth, social security number and address were stolen as part of a large

data breach.  Based on Plaintiff's filings with credit bureau reporting agencies, Capital One,

American Express and Citibank concluded that Plaintiff had been a victim of credit card fraud

and closed the credit cards that were open in his name.

### C.   Chase's Oral and Written Questioning of Plaintiff

On November 13, 2012, Guilfoyle asked Plaintiff to come to Guilfoyle's office in Nanuet

for a meeting.  On the phone, Guilfoyle identified himself as associated with GSI.  Plaintiff went

to meet Guilfoyle at his office later that day.  Each party's account of the meeting differs

significantly.

In Defendant's version of events, Guilfoyle conducted a stern, but not harassing,

investigatory interview.  According to Defendant, Guilfoyle took Plaintiff to a conference room

and partially closed the door behind him.  Guilfoyle explained to Plaintiff the information he had

about Plaintiff's credit card applications and Plaintiff's credit bureau reports.  Guilfoyle asked

Plaintiff to explain the situation, which Plaintiff failed to do.  When Guilfoyle asked Plaintiff

whether he had ever applied for any of the four credit cards, Plaintiff loosened his tie, unbuttoned

his shirt and told Defendant he was not feeling well.  Guilfoyle offered to call for medical

assistance, which Defendant repeatedly refused.  Guilfoyle immediately stopped the interview

and notified Human Resources.

By Plaintiff's account, the interview was far more aggressive.  According to Plaintiff,

Guilfoyle took him to an empty conference room and closed the door completely.  Guilfoyle

directly accused him of opening several credit cards, making charges on them, not paying them

and then filing fraudulent credit bureau reports.  Plaintiff denied the allegations.  Guilfoyle

repeated his allegations.  Guilfoyle told Plaintiff that he used to work for the NYPD and had

arrested many people; that Plaintiff would be criminally prosecuted if he did not admit to the

5

fraud; and that Plaintiff would lose his job and never again work in the "financial industry or any industry ever."  Guilfoyle screamed at Plaintiff, banged the door and repeatedly referred to his connections at the NYPD who could "make sure that [Plaintiff] pay[s] for what [he had] done."  Plaintiff, who suffers from a heart condition, began to experience chest pain.  Plaintiff asked to leave so that he could take his medications, which were in his car, but Guilfoyle refused to let him leave.  Guilfoyle questioned Plaintiff about the "supposed medication" Plaintiff needed and told Plaintiff he could not leave.  Guilfoyle kept questioning Plaintiff despite his deteriorating condition and allowed Plaintiff to leave only when Plaintiff said that not taking his medications could result in a heart attack.  As Plaintiff walked out, Guilfoyle followed him and repeatedly mentioned his NYPD contacts and instructed Plaintiff to confess.  Plaintiff collapsed in the parking lot.  The next day, Plaintiff visited a doctor who diagnosed him with PTSD as a result of his encounter with Guilfoyle.

After this encounter, Guilfoyle tried to set up another meeting with Plaintiff.  On January 10, 2013, Plaintiff's supervisor, Padilla, told him to report for a meeting later that day with the Chase District Manager.  Padilla said the meeting was to discuss Plaintiff's position in light of the changes at Chase.  When Plaintiff arrived at the District Manager's office for the meeting, he found Guilfoyle and another GSI investigator waiting for him, with a Human Resources staff member on the telephone.  Plaintiff was introduced to all present and informed that he would be interviewed about the credit cards.  In response, Defendant said that he felt ambushed and demanded and received the names of all in attendance.  Defendant claimed that he had chest pains and an elevated heart rate.  An ambulance was requested and Plaintiff was offered treatment on the spot.  Chase attempted to schedule another interview for February 14, 2013, but Plaintiff did not appear.

Chase then sent Plaintiff written questions about the suspected credit card activity.  Based on Plaintiff's responses, and a review of the remaining evidence, Guilfoyle believed Plaintiff had engaged in fraudulent conduct, and communicated this conclusion to Padilla and Human Resources.  As a result, Plaintiff was terminated from his position on March 27, 2013.

### D.  Plaintiff's Allegations Against Chase

Plaintiff claims that while he worked at Chase under Padilla, she regularly discriminated against him.  Padilla steered clients away from Plaintiff.  At his deposition, Plaintiff said Padilla had joked about his Albanian heritage "several times": "Maybe I'm Albanian, I belong to mafia or I'm doing something crooked.  Because I'm Albanian I can't be trusted, et cetera."  Other employees picked up on her comments and made similar jokes about Plaintiff.

Finally, Plaintiff claims that Defendant published a false statement to Financial Industry Regulatory Authority's ("FINRA") BrokerCheck Report by stating that he had been terminated for "ma[king] fraud claims on Chase credit cards where he was responsible for the related activity."  According to Chase, it made the statement on a Uniform Termination Notice for Securities Industry Registration (Form U-5) to FINRA because such disclosures are required.

## II.    LEGAL STANDARD

The standard for summary judgment is well established.  Summary judgment is appropriate where the record before the court establishes that there is no "genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine dispute as to a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The court must construe the evidence in the light most favorable to the non-moving party and must draw all reasonable inferences in the non-moving party's favor.  *See Young v.*

7

*United Parcel Serv., Inc*., --- S. Ct. ---, 2015 WL 1310745, at *17 (U.S. Mar. 25, 2015); *ln re*

*"Agent Orange" Prod. Liab. Litig*., 517 F.3d 76, 87 (2d Cir. 2008).

## III.   DISCUSSION

 Plaintiff alleges the following causes of action against Defendant: (1) IIED, (2) false

imprisonment, (3) FDCPA violations, (4) defamation, (5) discrimination in violation of the

NYSHRL and (6) discrimination in violation of the NYCHRL.[2]   Summary judgment is denied as

to the IIED and false imprisonment claims, and granted as to all other claims.

### A.   Intentional Infliction of Emotional Distress

 Defendant's motion for summary judgment on the IIED claim is denied because issues of

material fact remain for the jury to resolve.

 In New York, the tort of intentional infliction of emotional distress has four elements: "(i)

extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of

causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and

(iv) severe emotional distress."   *Howell v. N. Y. Post Co*., 81 N.Y.2d 115, 121 (1993).   "[T]he

'requirements of the rule are rigorous, and difficult to satisfy.'" *Id.* at 122 (quoting Prosser and

Keeton, Torts § 12, at 60-61 (5th ed.)).   "Liability has been found only where the conduct has

been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of

decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."   *Id.*

---

[2] Plaintiff initially also alleged (1) invasion of privacy by intrusion upon seclusion, (2) negligent hiring and supervision and (3) abuse of process.  However, by letter dated May 1, 2014, Plaintiff explicitly withdrew invasion of privacy and negligent hiring claims; and on August 11, 2014, by an affirmation of his counsel submitted in connection with this motion, withdrew the abuse of process claim.  Plaintiff's Complaint also contains a cause of action that he labels "agency," which seeks to hold Defendant responsible for the actions of its employee James Guilfoyle. Because agency is a theory of liability and not a cause of action, Plaintiff's cause of action under "agency" is dismissed.

(internal quotation marks omitted).  To withstand summary judgment on an IIED claim, a plaintiff must typically offer evidence of severe emotional injury.  *See Biberaj v. Pritchard Indus., Inc.*, 859 F. Supp. 2d 549, 565 (S.D.N.Y. 2012) (collecting cases).

IIED is "a highly disfavored tort under New York law," but the New York Court of Appeals has stopped short of barring such a claim when other tort or statutory claims cover the same conduct and damages.  *Turley v. ISG Lackawanna, Inc*., 774 F.3d 140, 158 (2d Cir. 2014) (characterizing the Court of Appeals' observation that an IIED claim may not be sustainable "where the conduct complained of falls well within the ambit of other traditional tort liability" as "*dictum*").  The Second Circuit in *Turley* stated that such a "consequential question" was best decided by certification to the New York Court of Appeals, but that certification was unnecessary because the procedural posture in *Turley* did not require an answer to the question.  *Id.* at 160. Therefore, in the present case, even though the IIED claim could be considered duplicative of the false imprisonment claim, the IIED claim is not dismissed on that ground.

As to the merits of Plaintiff's claim, the New York Supreme Court Appellate Division's decision in *Kaminski v. United Parcel Service*, 501 N.Y.S.2d 871 (1st Dep't 1986), is instructive. In *Kaminski*, a UPS employee who had once been a Rikers Island security guard, was told to report to an office where three other UPS workers accused him

> of not having reported the receipt of a cash payment for a package.  Plaintiff denied the charge.  The defendants told plaintiff he had been identified as the thief by two eye witnesses.  They then allegedly began to threaten him with a criminal prosecution and a prison term at Riker's Island if plaintiff did not admit stealing the money, agree to return the money, resign, and waive his rights to all health, hospital and pension benefits.  Plaintiff alleges that for three hours he was subjected to these threats which were accompanied by loud, aggressive, profane and obscene language and gestures.  At all times one or another of the defendants was blocking the door to the office.  Finally, . . . allegedly under duress and still denying the accusation, plaintiff signed resignation papers and documents relinquishing his pension plan and health and hospital benefits and statements admitting his guilt.

*Kaminski*, 501 N.Y.S.2d at 872.  The two eyewitnesses who had identified the plaintiff as the culprit later recanted their identification, and a different UPS employee was eventually found responsible for the theft.  *Id.*  Based on these facts, the court found that the plaintiff had "adequately state[d] a cause of action for intentional infliction of emotional distress."  *Id.* at 873.

Crediting Plaintiff's version of the events as recounted above, the facts here are substantially similar to those in *Kaminski.*  Further, Plaintiff has proffered evidence of severe emotional injury: a doctor diagnosed Plaintiff with PTSD as a result of Plaintiff's encounter with Guilfoyle.  This course of events -- if credited by a jury -- may be sufficiently extreme to sustain an IIED claim.

The success of Plaintiff's IIED claim will ultimately turn on whether the jury believes Plaintiff, Defendant, or some combination of their narratives about what occurred during the questioning of Plaintiff, and whether it believes that Guilfoyle's conduct was "beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community" as required for an IIED claim.  *Howell*, 81 N.Y.2d at 122.  Because these issues alone are sufficient to defeat summary judgment, Defendant's remaining arguments are not addressed.

## B. False Imprisonment

Summary judgment is also denied on the false imprisonment claim.

"[A]s to false imprisonment, New York courts require a plaintiff to show: (1) that the defendant intended to confine the plaintiff, (2) that the plaintiff was aware of the confinement, (3) that the plaintiff did not consent to the confinement, and (4) that the confinement was not otherwise privileged."  *King v. Crossland Sav. Bank*, 111 F.3d 251, 255 (2d Cir. 1997).

According to Plaintiff, Guilfoyle detained Plaintiff in a conference room with the door closed and would not allow Plaintiff to leave despite his request to do so, seemingly until Plaintiff admitted Guilfoyle's accusations. Plaintiff finally was permitted to leave when he said that he might have a heart attack unless he retrieved and took his medication. As Defendant has not argued that Plaintiff's confinement was privileged, a reasonable jury could conclude that Plaintiff has established every element of the tort of false imprisonment.

In urging summary judgment, Defendant relies on inapposite cases that are readily distinguishable. First, unlike other cases in which employees complain of false imprisonment based on investigatory interviews, Plaintiff's claim does not rely on a mere assumption that he could not leave the interview. Rather, according to Plaintiff, Guilfoyle confined him in a room, closed the door and told him that he could not leave the room, even when Plaintiff asked to do so. *Cf. Cellamare v. Millbank, Tweed, Hadley & McCloy LLP*, No. 03 Civ. 0039, 2003 WL 22937683, at *8 (E.D.N.Y. Dec. 2, 2003) (dismissing false imprisonment claim where "Milbank did not tell Cellamare that she was not free to leave and there is no allegation that Milbank forced her to stay"); *Arrington v. Liz Claiborne, Inc.*, 688 N.Y.S.2d 544, 546 (1st Dep't 1999) (dismissing false imprisonment claim where the plaintiffs "'believed' that the door to the office was locked and they 'felt' that they were not free to leave"); *LaBua v. Brinckerhoff*, 2013 WL 5785924 (N.Y. Sup. Ct., Oct. 21, 2013) (dismissing false imprisonment claim where the "plaintiff d[id] not recall if the door was locked" and the plaintiff "did not attempt to leave because she 'was scared to death'"). Second, and unlike *Arrington*, Plaintiff's claim of false imprisonment does not rely on Guilfoyle's threats of prosecution to "constitute [the] detaining force necessary to establish the tort," but relies on explicit instructions not to leave the room. 688 N.Y.S.2d at 546.

Because Plaintiff has raised material issues of fact as to whether Defendant intended to confine him and whether he was in fact confined, summary judgment is denied.

### C.  FDCPA Violations

Defendant's motion for summary judgment on Defendant's FDCPA claim is granted because this case does not involve the "collection of debt" by a "debt collector," which is required by the statute.

The Complaint alleges that Defendant violated 15 U.S.C. §§ 1692d, 1692e and 1692f, all of which prohibit certain conduct "in connection with collection of a debt" or "to collect or attempt to collect any debt."  The factual allegations underlying this claim are unclear.  In the Verified Complaint, the FDCPA claim incorporates by reference the preceding paragraphs (which do not mention any debt collection activity) and alleges generally that Defendant "repeatedly engag[ed] the Plaintiff in phone calls and verbally abus[ed] the Plaintiff."  Nothing in the evidentiary record suggests that the Defendant's conduct was for the purpose of collecting a debt.  Rather, the evidence shows that Guilfoyle was attempting to make Plaintiff admit that he engaged in fraudulent activity.

In addition, each of the statutory provisions prohibits activity by a "debt collector."  Nothing in the record supports a finding that Chase either "uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts," or that Chase "regularly collects or attempts to collect . . . debts owed or due or asserted to be owed or due another," as required by the statute.  15 U.S.C. § 1692a(6).

### D.  Defamation

Plaintiff argues that Defendant published a false statement to FINRA's BrokerCheck Report and accordingly defamed him.  Defendant's motion for summary judgment on Plaintiff's

defamation claim is granted because "[s]tatements made by an employer on a [FINRA] employee termination notice are subject to an absolute privilege in a suit for defamation."  *Rosenberg v. MetLife, Inc*., 8 N.Y.3d 359, 368 (2007).

### E.  Hostile Work Environment -- New York State Human Rights Law

In his Eighth Cause of Action, Plaintiff alleges "a pervasive atmosphere perpetuating discrimination" in violation of the NYSHRL.  In his opposition to the summary judgment motion, Plaintiff makes clear that his theory of liability is one of a hostile work environment based on his Albanian national origin.

> In order to prevail on a hostile work environment claim, a plaintiff must make two showings: (1) that the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment and (2) that there is a specific basis for imputing the conduct creating the hostile work environment to the employer.

*Summa v. Hofstra Univ.*, 708 F.3d 115, 124 (2d Cir. 2013) (quoting *Duch v. Jakubek*, 588 F.3d 757, 762 (2d Cir. 2009)).

Regarding the first prong, the plaintiff must show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment."  *Aulicino v. N.Y.C. Dep't of Homeless Servs*., 580 F.3d 73, 82 (2d Cir. 2009) (internal quotation marks omitted) (quoting *Harris v. Forklift Sys., Inc*., 510 U.S. 17, 21 (1993)); *see also Forrest v. Jewish Guild for the Blind*, 3 N.Y.3d 295, 305, 310-11 (2004) (applying the *Harris* standard to New York state law claim of hostile work environment). "This test has objective and subjective elements: the misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive."  *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (internal quotation marks omitted).

13

The Second Circuit has "made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment." *Id.* (citations and internal quotation marks omitted). "To decide whether the threshold has been reached, courts examine the case-specific circumstances in their totality and evaluate the severity, frequency, and degree of the abuse." *Id.* "[R]elevant factors include 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id.* (quoting *Harris*, 510 U.S. at 23). "As a general rule, incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Feingold v. New York*, 366 F.3d 138, 150 (2d Cir. 2004) (citation and internal quotation marks omitted). Although one encounter may constitute a hostile work environment if it is sufficiently severe, conduct that can be categorized as a few isolated incidents, teasing, casual comments or sporadic conversation will not be deemed to create a hostile work environment. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998); *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 768 (2d Cir. 1998).

Plaintiff has failed to adduce evidence from which a reasonable jury could find a hostile work environment. Plaintiff bases his claim on the following: (1) His supervisor, Padilla, treated him differently and did not give him the same access to clients as his co-workers; (2) Padilla said Plaintiff must be with the mafia and that he could not be trusted; (3) Padilla said that Plaintiff must be crooked because he was Albanian; and (4) Padilla's comments encouraged others at the branch to make jokes about Plaintiff.

These facts, either on their own or taken together, are insufficient to establish that the workplace was "permeated with discriminatory intimidation, ridicule and insult." As an initial matter, Plaintiff's claim that Padilla did not give him the same access to clients does not involve

any intimidation, ridicule or insult.  As to the comments about Plaintiff and his national origin, there is no evidence about their frequency or that any such comment was made more than once. The comments described are not sufficiently severe or pervasive to alter the work environment. Finally, none of the conduct Plaintiff describes was physically threatening or constituted humiliation beyond mere offense.  "[C]onsidered cumulatively in order to obtain a realistic view of the work environment," Plaintiff's allegations of discrimination are insufficient to sustain a claim for hostile work environment.  *Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997).  Accordingly, Defendant's motion for summary judgment on the NYSHRL claim is granted.

### F.  New York City Human Rights Law

The New York Court of Appeals has "confine[d] the protections of the NYCHRL to those who are meant to be protected -- those who work in [New York] city."  *Hoffman v. Parade Publ'ns*, 15 N.Y.3d 285, 291 (2010).  *Accord Robles v. Cox & Co.*, 841 F. Supp. 2d 615, 625 (E.D.N.Y. 2012) ("[W]here the alleged discriminatory act takes place outside of New York City, the relevant location of the injury for purposes of the [NYCHRL] analysis is not the Plaintiff's residence, but the Plaintiff's place of employment.").  Because there is no dispute that Plaintiff worked outside of New York City, his NYCHRL claims are dismissed.

### IV.  CONCLUSION

For the foregoing reasons, Defendant's motion is GRANTED in PART and DENIED in part.  Only Plaintiff's IIED and false imprisonment claims can proceed to trial.  The parties are directed to appear for a conference on **April 9, 2015**, at **11:00 a.m.** to schedule a firm trial date.

The Clerk of Court is directed to correct the names of the parties on the docket as reflected in the caption on the first page of this Opinion and to close the motion at Dkt. No. 28.

SO ORDERED.

Dated: March 27, 2015
New York, New York

**LORNA G. SCHOFIELD**
**UNITED STATES DISTRICT JUDGE**